# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ELTON GATES and LUSTER NELSON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 04 C 2155 |
| | ) | |
| Officer B. TOWERY, Star No. 8233, Officer | ) | Judge Ruben Castillo |
| P. GALIARDO, Star No. 19174, Officer | ) | |
| ECHOLS, Star No. 12329, Officer | ) | |
| COLLIER, Star No. 18240, PHILIP CLINE, | ) | |
| Superintendent of Police for the City of | ) | |
| Chicago, and the CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Elton Gates and Luster Nelson (collectively "Plaintiffs"), have brought a class

action law suit against the City of Chicago ("the City") and Superintendent of Police, Philip

Cline (together, "the City Defendants"), as well as Chicago police officers Brian Towery, Paul

Galiardo, James Echols, and Dwayne Collier, who are being sued in their individual capacities

(together, "Officer Defendants") (all collectively, "Defendants"). Plaintiffs allege that

Defendants violated the Due Process Clause of the Fifth and Fourteenth Amendments as

enforced by 42 U.S.C. § 1983 by: seizing money found in the vicinity of a person placed under

arrest, issuing an inventory receipt for the money stating that the arrestee will be notified when

the money is available for release, and then never providing notice that the money is available.

(R. 192-2, Fifth Am. Compl. at 2-4, 6-8.) Plaintiffs also attack the constitutionality of the letters

that the CPD mails to narcotics arrestees informing them that their money is available to be

picked up, alleging that the letters provide inadequate notice. (R. 370, Pls.' Reply in Support of

Summ. J. at 17.) Plaintiffs also have brought state law claims for conversion and replevin,

alleging that Defendants ignored their repeated demands for the return of their property, and as a result, unlawfully converted money that rightfully belongs to Plaintiffs. (R. 192-2, Fifth Am. Compl. at 11-12.)

Presently before this Court are the parties' cross-motions for summary judgment. (R. 268, City Defs.' Mot. for Summ. J; R. 313, Pls.' Mot. for Summ. J.; R. 321, Officer Defs.' Mot. for Summ. J.) This will be the sixth opinion issued in this case, including one decision that has been appealed to and affirmed by the United States Court of Appeals for the Seventh Circuit. *See Gates v. Towery*, 331 F. Supp. 2d 666 (N.D. Ill. 2004) ("*Gates I*") (partially granting and partially denying Plaintiffs' motion to reconsider); *Gates v. Towery*, No. 04 C 2155, 2004 WL 2583905 (N.D. Ill. Nov. 10, 2004) ("*Gates II*") (granting Plaintiffs' motion for class certification), *aff'd*, 430 F.3d 429 (7th Cir. 2005) ("*Gates III*"); *Gates v. Towery*, 435 F. Supp. 2d 794 (N.D. Ill. 2006) ("*Gates IV*") (partially granting and partially denying Defendants' motion to dismiss); *Gates v. Towery*, 456 F. Supp. 2d 953 (N.D. Ill. 2006) ("*Gates V*") (redefining the class and partially granting Defendants' motion to dismiss). The extensive procedural history of this case was outlined by this Court in an earlier decision, and will not be recounted here. *See Gates V*, 456 F. Supp. 2d at 957-958. For purposes of the claims under the Fifth and Fourteenth Amendments, the due process class has been divided into a non-narcotics subclass and a narcotics subclass:

> (1) All those persons who, after March 23, 2002, and before December 14, 2004, had property taken from them upon their arrests by Chicago police officers provided: a) the criminal charges against them have been resolved in the trial court; b) no forfeiture action was commenced against the seized property; c) the time for filing a forfeiture action has expired; d) the property was not inventoried as evidence in any criminal investigation; e) the arrestee was issued an inventory receipt when arrested indicating that the arrestee would be notified when the property was available for pick-up; f) the arrestee never received notice that the property was ready for return; g) the money has not been returned

to the arrestee, and h) the arrestee was not arrested for a narcotics offense.

(2) All those persons who, after March 23, 2002, and before December 14, 2004, had property taken from them upon their arrests by Chicago police officers provided: a) the criminal charges against them have been resolved in the trial court; b) no forfeiture action was commenced against the seized property; c) the time for filing a forfeiture action has expired; d) the property was not inventoried as evidence in any criminal investigation; e) the arrestee was issued an inventory receipt when arrested indicating that the arrestee would be notified when the property was available for pick-up; f) the arrestee never received notice that the property was ready for return; g) the money has not been returned to the arrestee; and h) the arrestee was arrested for a narcotics offense.

*Gates V*, 456 F.Supp.2d at 969-70. Pursuant to these definitions, Plaintiff Gates represents the

first due process subclass, challenging the inventory receipt; and Plaintiff Nelson represents the

second due process subclass, challenging the notice mailed to narcotics arrestees (hereinafter

"*Pollard*" notice). *Gates V*, 456 F. Supp. at 967-68. Both Plaintiffs also represent a

supplemental class for purposes of the conversion and replevin state law claims defined as:

All those persons who, after March 23, 2003, had property taken from them upon their arrests by Chicago police officers provided: a) the criminal charges against them have been resolved in the trial court; b) no forfeiture action was commenced against the seized property; c) the time for filing a forfeiture action has expired; d) the property was not inventoried as evidence in any criminal investigation; the arrestee either demanded possession of the money seized or demand would have been futile under the circumstances; and e) the money has not been returned to the arrestee.

*Gates V*, 456 F. Supp. 2d at 970.

Initially, we note that Plaintiffs failed to file a response to the Officer Defendants' motion

for summary judgment by the June 22, 2007, deadline set by this Court, instead representing in a

July 10, 2007, memorandum to the Court that they do not oppose the dismissal of their claims

against the Officer Defendants. (R. 380, Pls.' Resp. to Def. Officers Defs.' Mot. for Summ. J. at

1.) Because Plaintiffs failed to respond to the Officer Defendants' motion for summary

3

judgment and Rule 56.1 Statement of Facts, we grant the Officer Defendants' motion for summary judgment in its entirety (R. 321-1). We resolve each of the remaining motions below.

## RELEVANT FACTS[1]

The issues in this case are whether arrestees are provided constitutionally adequate notice about the process by which they may reclaim money inventoried by the Chicago Police Department ("CPD") at the time of arrest, and also whether the CPD unlawfully converted the arrestees' property by ignoring their demands for the return of the property. Plaintiffs allege that the Property Inventory CPD-34.523 ("inventory receipt") that all individuals receive at the time of arrest are false and misleading, and the *Pollard* notice that the CPD's Asset Forfeiture Unit sends to arrestees who had money inventoried following a narcotics-related arrest provides constitutionally inadequate notice.

The constitutionality of the *Pollard* notice was the subject of previous litigation. In *Pollard v. Daley*, 87 C 2401 (N.D. Ill. 1987), a class of arrestees sued the City, alleging that the City took money from individuals arrested for narcotics violations at the time of their arrest, but then neither instituted forfeiture proceedings nor returned the money. *Gates V*, 456 F. Supp. at 961. The court subsequently entered a decree that set forth a procedure for notifying future arrestees that their property was available for return. Pursuant to this decree, the City has to send the *Pollard* notice to the individual's address as provided on the inventory receipt, detailing the amount of money seized, where the individual must go to reclaim the money, and the documentation needed to reclaim the money. (R. 351-2, Not. of Pls.' Supplemental Mot. to Enforce *Pollard* Consent Decree, Ex. A, Final Consent Decree at 6; R. 276-4, City Defs.' Facts,

---

[1] These facts are derived from the parties' statements of facts filed pursuant to Local Rule 56.1(b). Unless otherwise indicated, the facts included herein are undisputed.

Ex. 2, *Pollard* notice.) Despite the *Pollard* decree, which provides injunctive relief, we found that Plaintiff Nelson could proceed with his class claims because he was not given an opportunity to opt out of the *Pollard* class, and he is seeking monetary, as opposed to, injunctive relief. *Gates V*, 456 F. Supp. at 966.

## I.    The Inventory Policy

When a person is arrested, the City's policy is to issue an inventory receipt for cash that is taken from the arrestee and retained by the arresting officers. (R. 334, City Defs.' Resp. to Pls.' Add'l Facts ¶ 3.) The CPD inventory policy is mandated by statute, 725 ILCS 5/108 *et seq.*, and is outlined in the CPD's General Orders, which are its internal guidelines. (R. 215, Ex. D, General Orders Re: Inventory System for Property Taken Into Custody.) The CPD issues thousands of inventory receipts for cash each year. (R. 332, City Defs.' Resp. to Pls.' Facts ¶ 42, 63.) Between March 23, 2002, and December 14, 2004, the total dollar value of the cash seized and inventoried involved millions of dollars. (*Id.* ¶ 64.) Prior to June 22, 2002, the CPD maintained a paper inventory system whereby officers inventoried recovered property by completing a carbon-based Property Inventory form. (R. 306, Pls.' Resp. to City Defs.' Facts ¶ 15.) Arrestees receive the Citizen Copy of the inventory receipt when the money is inventoried. (*Id.*) On June 1, 2002, CPD implemented an electronic Property Inventory system known as eTrack. (*Id.* ¶ 18.) With eTrack, instead of completing the paper Property Inventory form-set, officers inventory property directly into a computer database. (*Id.* ¶ 21.)

The cash inventories are eventually deposited into one of two bank accounts, with all of the narcotics related money going into one account and all non-narcotics related money going into a different bank account. (R. 332, City Defs.' Resp. to Pls.' Facts ¶ 49.) The Asset Forfeiture Unit analyzes property inventories containing money on a daily basis and segregates

5

those related to narcotics for potential forfeiture. (R. 306, Pls.' Resp. to City Defs.' Facts ¶ 40.) Between March 2002 and December 2004, it was CPD practice not to seek forfeiture of narcotics inventories of $130 or less, but it did seek forfeiture of non-narcotics inventories where authorized by statute. (R. 313, Pls.' Mot. for Summ. J., Ex. 28, Cline Dep. at 12-13.) The Asset Forfeiture Unit sends notices to each person arrested for a narcotics offense from whom between $130 and less then $1000 was inventoried, indicating that there will be a forfeiture proceeding against the inventoried money. (*Id.* ¶ 43.)

### A. Non-Narcotics Arrests

The inventory receipts list three options for the disposal of the property and the arresting officer has to check one: "Hold for investigation and/or evidence;" "Property owner notified on [date] to pick up property within 30 days or property will be disposed of;" and "To be disposed of by custodian (not to be returned) (This applies if property is not evidence not returnable and/or owner is unknown)." (R. 313, Pls.' Mot. for Summ. J., Exs. 1 and 2, Gates/Nelson Inventory Receipts.)

The inventory receipt given to non-narcotics arrestees has a section entitled, "Notice to Property Owner or Claimant." (*Id.*, Ex. 1, Gates Inventory Receipt.) Directly beneath this is a subtitle, "Property Release Order (CPD-34.554) Required." (*Id.*) Below this phrase, this section instructs property owners to:

> Return to the police statute where your property was taken from you. Give this copy to the desk officer in charge for forms and instructions necessary for the return of your property.
>
> Upon official notification that inventoried property is available for release, the subject owner or claimant must pick up the property within 30 days of notification or the property will be legally disposed of according to the directions of the law.

6

(*Id.*) The inventory receipt also has an area labeled "Arrestee Information" and includes the relevant statutory provisions that govern both seizures with an arrest warrant, 725 ILCS 5/108-10, and seizures without an arrest warrant, 725 ILCS 5/108-2. (*Id.*)

Funds that are subject to asset forfeiture, connected to a crime, or if ownership is uncertain, must be inventoried under the "Hold for investigation and/or evidence" option. (R. 306, Pls.' Resp. to City Defs.' Facts ¶¶ 30-31.) When this box was marked, the inventoried cash is not immediately returnable to the arrestee. (R. 332, City Defs.' Resp. to Pls.' Facts ¶ 39.) Thus, the inventory receipts do not expressly advise those owners whose inventory receipts are marked "Hold for investigation and/or evidence" that the "Notice to Property Owner or Claimant" instructions do not apply to them. (*Id* ¶ 27.) If the arresting officer selects option two and notifies the property owner to collect his property, then he must also indicate how the owner was notified. (*Id.*) The inventory receipt, however, does not inform owners when, under what circumstances, or in what form the "official notification" will be sent. (*Id.* ¶ 29.)

An arrestee can reclaim funds inventoried "Hold for investigation and/or evidence" following a non-narcotic arrest if the arrestee presents to the CPD's Evidence Recovery and Property Section either: (a) a criminal court order stating that the funds may be released; or (b) a completed Property Release Order (CPD-34.554), commonly referred to as a "Form 54." (R. 306, Pls.' Resp. to City Defs.' Facts ¶ 33.) To obtain a Form 54, an arrestee has to return to the district of arrest and present the inventory receipt to the desk sergeant, who then attempts to connect the arrestee with the arresting officer. (*Id.* ¶ 35.) Form 54s are issued by the arresting officer to owners for inventoried property that is longer needed. (*Id.* ¶ 34.) On the inventory receipt, there is a box to the left of the phrase "Property Release Order (CPD-34.554) Required,"

which, if marked, indicates that the recipient of the inventory receipt must get a Form 54 signed to secure the release of his property. (*Id.* ¶ 35; R. 332, City Defs.' Resp. to Pls.' Facts ¶ 35.)

Prior to December 14, 2004, the inventory forms also omitted information pertaining to the circumstances in which an owner has to obtain a court order in order to secure the return of their property. (R. 332, City Defs.' Resp. to Pls.' Facts ¶ 31.) From March 2002 to December 14, 2004, when a criminal case was completed and the time for forfeiture had expired, an arrestee needed either a signed Form 54 or a court order to secure the return of inventoried property, provided the inventory receipt was not marked as narcotics related. (*Id.* ¶ 55.)

### B.    Narcotics Arrests

Narcotics arrestees receive both an inventory receipt and a *Pollard* notice. The Asset Forfeiture Unit mails the notice to each person arrested for a narcotics offense when the amount is less than $1000; the City has declined to seek forfeiture of the money; and the money is available to be returned to its owner. (R. 306, Pls.' Resp. to Defs.' Facts ¶ 43.) In addition, unlike the inventory receipt given to non-narcotics arrestees, the inventory receipt given to narcotics arrestees does not have a "Notice to Property Owner or Claimant"[3] nor an "Arrestee Information" section. It has a place where the owner signs to acknowledge receipt of the inventoried property, and also a section entitled "Court Order - Disposal Instructions." (R. 313, Pls.' Mot. for Summ. J., Ex. 2, Nelson Inventory Receipt.) Despite this difference, the inventory receipts are substantially the same in all other respects.

---

[3] Plaintiffs claim that Nelson's inventory receipt included the "Notice to Property Owner or Claimant" section, and Defendants admitted this statement. (R. 334, City Defs.' Resp. to Pls.' Add'l Facts ¶ 30.) However, after reviewing the inventory receipt, this Court did not find a "Notice to Property Owner or Claimant" section on the receipt.

Similar to non-narcotics inventories, when property is marked "Hold for investigation and/or evidence," the "Notice to Property Owner or Claimant" instructions do not apply. (R. 332, City Defs.' Resp. to Pls. Facts ¶ 27.) Therefore, an individual arrested for a narcotics related offense can reclaim those funds inventoried "Hold for investigation and/or evidence," but not subject to forfeiture, by presenting to the CPD's Evidence Recovery and Property Section proper identification and either: (a) the *Pollard* notice; (b) a notice from the State's Attorney's Office following the settlement of the forfeiture action; or (c) a court order from the Asset Forfeiture Court stating that the funds may be released. (R. 306, Pls.' Resp. to City Defs.' Facts ¶ 39.) Plaintiffs dispute that any one of these documents by itself is sufficient to reclaim the inventoried property that is narcotics related, and argue the arrestee must present both proper identification and either: the *Pollard* notice and a court order from the Asset Forfeiture Court, or in the alternative, a Form 54 and the *Pollard* notice. (*Id.*) Unlike non-narcotics inventories, however, a criminal court order is not sufficient to secure the release of cash that is designated "narcotics related" on the inventory receipt. (R. 332, City Defs.' Resp. to Pls.' Facts ¶ 62.)

## II.    The Gates Arrest and Inventory

Chicago police officers Towery and Galiardo arrested Plaintiff Gates on January 14, 2003, for aggravated battery. (R. 332, City Defs.' Resp. to Pl.'s Facts ¶ 6.) When he was arrested, Gates had $113 in his possession. (*Id.*) During their search of Gates, the police took the $113 in his possession, and gave Gates an inventory receipt for the money. (*Id.* ¶ 7; R. 313, Pls.' Mot. for Summ. J., Ex. 1, Gates Inventory Receipt.) With respect to Gates, the arresting officers checked the "Hold for investigation and/or evidence" box on his inventory receipt. (*Id.*) Officer Towery listed Gates as the "owner" of the $113 inventoried. (*Id.*)

9

On June 26, 2003, Gates pled guilty to aggravated battery of a police officer and was sentenced to two years probation. (R. 332, City Defs.' Resp. to Pls.' Facts ¶ 9.) The City did not request a forfeiture of the $113 that was inventoried during Gates' arrest. (*Id.* ¶ 12.) Gates further alleges that he attempted to reclaim the $113 on multiple occasions after he entered his guilty plea. (*Id.* ¶ 13.) The CPD, however, would not release Gates' inventoried cash from the Evidence Recovery and Property Section with only proper identification and his inventory receipt. (R. 306, Pls.' Resp. to City Defs. Facts ¶ 56.) To secure the release of his inventoried cash, Gates needed proper identification, his inventory receipt and an executed Form 54 or court order, but the inventory receipt did not expressly advise him of this. (*Id.* ¶¶ 56-57.) The CPD informed Gates what documentation was needed to secure the release of his property. (R. 313, Pls.' Mot. for Summ. J., Ex. 5, Gates Dep. at 59, 61, 62, 75.)

As of the date this suit was filed, the City had not returned Gates' money. (R. 332, City Defs.' Facts ¶ 14.) The City, however, notified Gates through his attorney on March 25, 2004 that his $113 was available to be returned to him, but it is not clear whether Gates accepted the money. (*Id.,* Ex. A, 3/25/04 Letter; R. 362, Pls.' Reply to City Defs.' Facts ¶ 2.)

**III.    The Nelson Arrest and Inventory**

Chicago police officers Echols and Collier arrested Plaintiff Nelson for a narcotics violation on February 4, 2004. (R. 332, City Defs.' Resp. to Pls.' Facts ¶ 15.) The police took $59 from Nelson and gave him an inventory receipt. (*Id*; R. 313, Pls.' Mot. for Summ. J., Ex. 2, Nelson Inventory Receipt.) On Nelson's inventory receipt, Officer Collier listed Nelson as the "owner" of the $59 inventoried. (R. 332, City Defs.' Resp. to Pls.' Facts ¶ 25; R. 313, Pls.' Mot. for Summ. J., Ex. 2, Nelson Inventory Receipt.) The arresting officers also checked the "Hold for investigation and/or evidence" box on Nelson's inventory receipt. (*Id.*) On March 3, 2004,

10

the criminal charges pending against Nelson were dismissed. (R. 332, City Defs.' Resp. to Pls.' Facts ¶ 21.) Neither the CPD nor the City requested forfeiture of Nelson's $59 at any time prior to the dismissal of the criminal charges. (*Id.* ¶ 21, 24.) Nelson alleges, and City Defendants do not dispute, that he went to the police station with his inventory receipt, but he was not successful in obtaining the money. (*Id.* ¶ 20.) The inventory receipt issued to him did not expressly advise him that the CPD's Evidence Recovery and Property Section would not release his money unless the Asset Forfeiture Unit instructed it to do so. (R. 306, Pls. Resp. to City Defs. Facts ¶ 58.) On June 3, 2004, after the filing of the complaint in this case, Defendants sent Nelson a check in the amount of $59, and a letter indicating that the City would also reimburse Nelson for any interest owed if he can provide evidence of the date in which he sought the return of his money. (R. 332, City Defs.' Resp. to Pls.' Facts, Ex. D., 6/3/04 Letter.)

## LEGAL STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 249 (citations and quotations omitted). When considering cross-motions for summary judgment, the Court will construe all facts and make all reasonable and justifiable inferences in favor of the party against whom the motion under

11

consideration was made. *Allen v. City of Chi.*, 351 F.3d 306, 311 (7th Cir. 2003). Further, the

Court cannot decide the credibility of witnesses or weigh the evidence in deciding a summary

judgment motion, as these are tasks for the trier of fact. *Keri v. Bd. of Trust. of Purdue Univ.*,

458 F.3d 620, 627 (7th Cir. 2006).

## LEGAL ANALYSIS

### I.    Section 1983 Due Process Claim

In order to prove that the City Defendants violated Plaintiffs' Fifth and Fourteenth

Amendment Rights as protected by Section 1983, Plaintiffs must show that the Defendants

"deprived [them] of a right secured by the Constitution or laws of the United States," and that

the Defendants "acted under color of state law." *Lekas v. Briley*, 405 F.3d 602, 606 (7th Cir.

2005) (*citing Brokaw v. Mercer County*, 235 F.3d 1000, 1009 (7th Cir. 2000)). In the instant

case, Plaintiffs seek to hold the City Defendants, as opposed to the Officer Defendants, liable

under Section 1983. A municipality, however, may not be held liable under Section 1983 based

on a theory of respondeat superior for the constitutional violations of its agents and employees.

*Monell v. Dep't. of Soc. Servs. of the City of New York*, 436 U.S. 658, 690-91(1978). Rather,

liability attaches to the municipality only when its officers inflict constitutional injury in the

execution of a municipality's official policy or custom. *Sornberger v. City of Knoxville, Ill.*, 434

F.3d 1006, 1029 (7th Cir. 2006) (*citing Monell*, 436 U.S. at 694). A plaintiff must show a

"direct causal link between the municipal policy and the constitutional deprivation." *Arlotta v.

Bradley Ctr.*, 349 F.3d 517, 522 (7th Cir. 2003) (internal citations omitted). In other words,

Plaintiffs must demonstrate that the municipality, and not just individual employees, "made a

deliberate choice among various alternatives and that the injury was caused by the policy."

12

*Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002) (*quoting Frake v. City of Chi.*, 210 F.3d 779, 781 (7th Cir. 2000)); *see also Pembaur v. Cincinnati*, 475 U.S. 469, 483-84 (1986).

Plaintiffs can establish municipal liability under Section 1983 by showing: (1) "an express policy that, when enforced, causes a constitutional deprivation; (2) "a 'wide-spread practice' that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a 'custom or usage' with the force of law"; or (3) "an allegation that the constitutional injury was caused by a person with 'final decision policymaking authority.'" *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). Plaintiffs attempt to proceed under all three prongs of municipal liability in challenging the constitutionality of the inventory receipts and the *Pollard* notices.

### A.     Inventory Receipts

#### 1.     Express Policy

The Plaintiffs allege that the notice provided to arrestees in the inventory receipts is constitutionally defective. The City claims, however, that Plaintiffs have not alleged that the constitutional deprivations result from the City's express inventory policy. Rather, the City asserts that Plaintiffs must prove an unconstitutional custom or practice, or that a person with final policymaking authority caused the constitutional harm, and therefore cannot proceed under the express policy prong. The Seventh Circuit has specifically rejected the argument that a plaintiff can attack a facially constitutional policy under the express policy prong of Section 1983 because of the way it is enforced, *Rasche v. Beecher*, 336 F.3d 588, 599 (7th Cir. 2003), unless the constitutional deprivations are caused by omissions in the policy, *Calhoun*, 408 F.3d at 379.

13

Here, Plaintiffs are not alleging that the constitutional deprivations are caused by omissions in the policy. Plaintiffs are, however, alleging that the inventory receipts are vague and misleading. Contrary to the City Defendants' argument, issuing inventory receipts is an "official policy" subject to the express policy prong of *Monell* because it applies to all arrestees, and is an integral and necessary part of the City's inventory policy. *See Pembaur*, 475 U.S. at 480-81 (stating that "'official policy' refers to formal rules or understandings that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time"). Thus, in proceeding under this prong and determining if the inventory receipts fail to provide proper notice, first we must determine what notice is due.

In *City of West Covina v. Perkins,* 525 U.S. 234 (1999), the Supreme Court found "that notice of the procedures for protecting one's property interests may be required when those procedures are arcane and are not set forth in documents accessible to the public," but there is no "general rule that notice of remedies and procedures is required." *Id.* at 242. Consequently, the Court found that the City of West Covina was not required to give the respondents notice of the state procedures for the return of seized property, or the information necessary to invoke these procedures because the Due Process Clause does not require "a State and its local entities to give detailed and specific instructions or advice to owners who seek return of property lawfully seized but no longer needed for police investigation or criminal prosecution." *Id.* at 236.

Plaintiffs argue that *West Covina* does not foreclose their claims for several reasons. First, they argue that the City's in-house procedures are arcane and the inventory receipts are misleading. (R. 358, Pls.' Corrected Resp. to City's Add'l Authority at 2.) In support of this argument, the Plaintiffs rely on a string of Second Circuit cases where the plaintiffs challenged the procedures used by the property clerk in New York City to return seized property. *See*

14

*McClendon v. Rosetti*, 460 F.2d 111 (2d Cir. 1972). In *McClendon*, the Court found that § 435-4.0 of the New York City Administrative Code, which governed the disposition of property being held by the property clerk, was unconstitutional because the prisoners whose property was being held by the clerk did not receive any meaningful notice of the procedures for recovering it. *Id.* The court also found that Section 435-4.0 "improperly placed the burden of proof on the prisoner to 'establish that he had a lawful title or property right in such property or money.'" *Id.*

Upon remand, the district court established constitutional procedures for the disposition of property held by the clerk, including notice procedures where the arrestees were given a voucher for seized property. *See Alexandre v. Cortes*, 140 F.3d 406, 409 (2d Cir. 1998) (discussing the district court's order). The City of New York, however, never amended its Administrative Code to reflect the Court's decision in *McClendon*, and subsequent litigation was brought by arrestees alleging due process violations because they never received a voucher and had to rely on the erroneous Administrative Code. *See Butler v. Castro*, 896 F.2d 698, 703 (2d Cir. 1990) ("We are not the first court to note that the Code fails to reflect in any meaningful respect the actual practices of the Police Department and its property clerk or the existing procedures for reclaiming such property.") (*citing Property Clerk v. Seroda*, 131 A.D.2d 289, 295 (N.Y. App. Div. 1987).

*McClendon* is distinguishable from the instant case. The *McClendon* plaintiffs were deprived of the use of their property without notice, and the court found that § 435-4.0 of the New York Administrative Code was unconstitutional for various other reasons. 460 F.2d at 115. While Plaintiffs do allege that the inventory receipts fail to provide meaningful notice, unlike *McClendon* and its progeny, Plaintiffs have not proven that the relevant administrative or statutory provisions are erroneous, unconstitutional, or not generally accessible. In fact, even if

15

the inventory receipt is "misleading" and "vague" as Plaintiffs claim, we have previously stated that a notice that cites a statute containing the information needed to challenge a municipality's deprivation of property is likely per se constitutional. *See McKenzie v. Chi.,* 97 C 284, 1999 WL 412614, at \*2 (N.D. Ill. May 28, 1999); *Kennedy v. Vill. of Oak Lawn,* 99 C 7917, 2001 WL 1001167, \*5 (N.D. Ill. Aug. 27, 2001) (finding that the notice at issue did not describe the procedure for challenging in state court the Village's proposed actions, but it is constitutionally adequate because it cites the relevant statutory procedure, which would have informed the plaintiff what actions needed to be taken); *see also United States v. Lopez,* 445 F.3d 90, 96 (2nd Cir. 2006) ("where judicial remedies are readily available in case law and statutes, due process is not offended where no notice of these remedies is provided"); *Arrington v. Helms,* 438 F.3d 1336, 1351 (11th Cir. 2006) (citing cases and stating that "for one hundred years, the Supreme Court has declared that a publicly available statute may be sufficient to provide . . . notice because individuals are presumptively charged with knowledge of such a statute"). In the instant case, the inventory receipt states the relevant statutory procedures pursuant to which the money is seized. (R. 313, Pls.' Mot. for Summ. J., Ex. 1, Gates inventory receipt .)

Plaintiffs argue, however, that the instant case is analogous to *McClendon* and distinguishable from *West Covina* because 725 ILCS 5/108 *et seq.,* which governs the return of seized property, fails to provide a remedy because it only applies to property "seized" and not "recovered."[4] We reject this argument for several reasons. Without distinguishing between whether the property should be characterized as "recovered" or "seized," Illinois courts have

---

[4] Throughout the filings, the City Defendants and the Plaintiffs quibble over whether Plaintiffs' money was "seized" following their arrest, or if it was "recovered." *(See, generally,* R. 332, City Defs.' Resp. to Pls.' Facts.)

16

applied Section 108 in situations where the property is confiscated at arrest because it might be used as either evidence against the owner or is subject to forfeiture; furthermore, these courts have held that Section 108 provides an adequate remedy to these individuals to recover their property. *See, for example, People ex rel. Carey v. Covelli*, 336 N.E. 2d 759, 764 (Ill. 1975) (finding that "the remedy . . . under Section 108-11 is adequate to protect . . . interests in property and privacy"). The parties' pointless argument over semantics fails to detract from this basic fact—Section 108 applies to property taken from individuals pursuant to arrest and provides a remedy for owners seeking the return of their property.[5]

Finally, we also reject Plaintiffs' allegation that Section 108 fails to provide a remedy because the criminal court never enters orders releasing money pending resolution of criminal charges. (R. 358, Pls.' Resp. to City Defs. Cit. of Add'l Authority at 4-5.) As evidence of this, Plaintiffs present a court transcript in which the court allegedly refused to enter an order returning the defendant's inventoried property. (R. 395, Pls.' Mot. to Supplement, Ex. C, Munoz transcript.) Plaintiffs contend that this establishes that a criminal court will never issue an order directing the return of inventoried money in accordance with 715 ILCS 5/108-2 and 108-11; therefore, Section 108 does not provide an adequate remedy. (*Id.* at 5-6.) Contrary to Plaintiffs'

---

[5] Plaintiffs also argue that Section 108 does not provide a remedy for Plaintiffs because the inventory receipts were not "signed under oath" as required by Section 108-10. (R. 356, Pls.' Resp. to City Defs. Cit. of Add'l Authority at 3-4.) The "signed under oath" requirement applies to seizures with a warrant pursuant to Section 108-10 whereas money taken from arrestees following an arrest are considered seizures without a warrant governed by Section 108-2. *See* 725 ILCS § 108-10 ("return of all . . . things seized shall be made . . . before the judge issuing the warrant . . . An inventory of any instruments, articles or things seized shall be filed with the return and signed under oath by the officer or person executing the warrant"). There is no mention of an oath requirement for property taken pursuant to an arrest and without a warrant, as is the case here. *See* 725 ILCS § 108-2.

17

assertion, the transcript indicates that the judge was willing to issue an order releasing the property, but only when the defendant provided documentation that the inventoried property would not be subject to forfeiture. (*Id.*, Ex. C., Munoz Transcript at 14-16.) In addition, the City has provided ample documentation that the criminal court frequently issues orders releasing inventoried property in non-narcotics cases. (R. 400-2, City Defs.' Opp. to Pls.' Mot. to Supplement, Ex. A, Ten Court Orders Releasing Inventoried Property.)

Plaintiffs argue, however, that because Plaintiffs' property was not turned over to the court, but instead was deposited in a City owned bank account, then Section 108-11 is not a remedy because "the Circuit Court has no control over the account and never is informed where the money was deposited." (R. 358, Pls.' Corrected Resp. to City's Add'l Authority at 4.) Contrary to Plaintiffs' assertion, it is irrelevant that the Circuit Court does not have actual possession of the Plaintiffs' cash because they receive a court copy of the inventory receipt, and the court also has the power, pursuant to Section 108, to order the City to return the property. (*See* R. 400-2, City Defs.' Opp. to Pls.' Mot. to Supplement, Ex. A, Ten Court Orders Releasing Inventoried Property.) Therefore, unlike the New York Administrative Code, the Illinois statutes provide an alternative source of information for those individuals who are uncertain about how to reclaim their property, and also a proper remedy for those individuals seeking the return of their property.

Individuals seeking more information about the City's inventory policy can also refer to the CPD's General Orders. The General Orders pertaining to the City's inventory policy are made available to the public during the Police Board's monthly meetings. Consequently, any individuals who lack clarity about how to recover their property can turn to either of these sources in order to find out how to obtain their property. Relying on *Gonzalez v. Sullivan*, 914

F.2d 1197 (9th Cir. 1990), Plaintiffs argue that the General Orders do not adequately provide notice because they should have a greater amount of detail and clarity than that provided. *Gonzalez*, however, is inapposite for the notice there provided *no details* as to how individuals can appeal a denial of social security benefits, and the Court found it sufficiently misleading because of the absence of this pertinent information. *Gonzalez*, 914 F.2d at 1203. *Gonzalez* also does not stand for the proposition that the CPD has to include every possible detail in the General Orders so as to anticipate and address every situation that may arise with regards to its inventory policy, especially where there is the inventory receipt and other public sources to which individuals can refer. *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (U.S. 1950) ("The notice must be of such nature as reasonably to convey the required information. . . . The criterion is not the possibility of conceivable injury but the just and reasonable character of the requirements, having reference to the subject with which the statute deals."); *see also Ostergren*, 125 F. Supp. 2d at 322 (finding that the notice in the Village's demolition letters were constitutionally sufficient even though they did not inform the Plaintiffs what repairs needed to be made in order to avoid demolition).

In any event, the General Orders discuss, in detail, both the inventory policy and the procedures that officers follow in implementing the policy. (R. 275, Ex. D, General Order Re: Inventory System for Property Taken in Custody.) Plaintiffs claim, among other things, that the directives are unclear because they instruct officers to obtain a court order authorizing the return of the property, and that this instruction would be "cryptic" to property owners. However, this directive could simply mean what it says— that the officer can obtain a court order dictating the return of the property. This would be consistent with the inventory receipt, which states that "Pursuant to State Law, property which is evidence requires a court order for release." (R. 313,

Pls.' Mot. for Summ. J., Ex. 1, Gates Inventory Receipt; *see also* Section 108-11 (investing the court to order the release of items seized pursuant to an arrest).) The inventory receipt does not say who has the responsibility of obtaining the court order, suggesting that either the officer, or in some cases, the owner may be able to obtain the court order. *See Carey,* 336 N.E. 2d 759, 764 (1975) ("section 108-11 does not prevent the court from releasing property seized . . . to the owners or those persons entitled to possession"); *People v. Canady*, 275 N.E. 2d 356, 360 (Ill. 1971) (discussing Section 108-11 and finding "no authority that the release of seized property to its owner violates due process"). Either way, contrary to Plaintiff's contention that the directives are "contradictory and hopelessly confusing," this Court cannot conclude, without more, that the General Orders do not aid individuals who are seeking the return of their property.

Furthermore, contrary to Plaintiff's assertion that there is no constitutionally adequate notice because the General Orders "are not available on the CPD web page" and that, while the date of the monthly meetings are available, the Police Board's webpage "does not include the agendas for those meetings," due process requires no other notice beyond that provided by the City. *See Atkins v. Parker*, 472 U.S. 115, 131 (1985) (noting that "the entire structure of our democratic government rests on the premise that the individual citizen is capable of informing himself about the particular policies that affect his destiny").

Likewise, the "Notice to Property Owner or Claimant" section of the inventory receipt is not obscure or misleading. Due process does not require the inventory receipt to contain every detail, especially where this information is sufficiently ascertainable from other sources. *City of W. Covina,* 525 U.S. at 239 (rejecting the idea that the notice must include specific information including, among other things, "the procedure for contesting the seizure or retention of the property taken" or "the fact of the search, its date, and the searching agency; the date of the

20

warrant, the issuing judge, and the court in which he or she serves; and the persons to be contacted for further information"). We find that the statutory provisions, the General Orders, and the inventory receipt are sufficient to give the Plaintiffs adequate notice of how to obtain their property. Accordingly, we reject Plaintiffs' claim that the City's express inventory policy is unconstitutional.

### 2. Unconstitutional Custom or Practice

To establish an unconstitutional custom or practice, the plaintiffs must show a "widespread practice that, although not authorized by written law and express policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *Sornberger*, 434 F.3d at 1029. Plaintiffs claim that the City has an unconstitutional custom or policy because the inventory policy has been in effect for years and has resulted in millions of dollars for the City. From the briefs, it appears as if Plaintiffs are attempting to argue that the custom or practice being challenged is the same as the express policy being challenged.[6] Accordingly, since this Court has found that the express policy is constitutional, if the practice mirrors the policy, then it too is constitutional. Outside of their reliance on the express inventory policy, which more appropriately falls under the first prong of municipal liability, Plaintiffs have failed to allege any other custom or practice that could be actionable under the "custom or practice" prong of municipal liability. (*See* R. 311, Pls.' Opp. to City Defs.' Mot. for Summ. J. at 12 (stating only that "there is ample evidence of a widespread custom or practice based on a pattern of repeated

---

[6] In their reply brief, Plaintiffs chastise the City for allegedly arguing that its practices diverge from its written policy, and subsequently proceed as if the policy and the practices are identical. (R. 370, Pls.' Reply in Support of Summ. J. at 4 (noting that "until now the City never has claimed that the officers on the street are deviating from the express policy, as described in the CPD directives. And even now the City has not offered any evidence suggesting that its practices diverge from its written policies.").

21

behavior").) The failure to identify a custom or practice obviously dooms the Plaintiffs' claim under this prong of municipal liability. *See Evans v. City of Chi.*, 04 C 3570, 2006 WL 463041, *12 (N.D. Ill. Jan. 6, 2006) ("A plaintiff seeking to impose liability upon a municipality under Section 1983 must identify a municipal 'policy' or 'custom' that caused the plaintiff's injury.")[7] Thus, we find that the Plaintiffs cannot establish that the City was acting according to an unconstitutional custom or practice.

### 3.    Constitutional Deprivation by Final Policymaker

Finally, Plaintiffs allege that Superintendent Cline and the City are liable for municipal liability under the "final policymaker" prong of municipal liability. "Only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." *St. Louis v. Praprotnik*, 485 U.S. 112, 123 (U.S. 1988) (internal citations omitted). Whether an official has "final policymaking authority" over a certain issue is a question answered by state or local law. *Id.* Thus, in order to hold Superintendent Cline and the

---

[7] In any event, Plaintiffs have failed to establish the requisite "deliberate indifference" required for municipal liability. In fact, they do not attempt to establish it, and instead erroneously argue that they do not have to prove deliberate indifference to succeed on any of the prongs. However, liability attaches where the municipality is deliberately indifferent to the constitutional rights of its inhabitants. *See County of Sacramento v. Lewis,* 523 U.S. 833, 850 n. 10 (1998) ("We have also employed deliberate indifference as a standard of culpability sufficient to identify a dereliction as reflective of municipal policy and to sustain a claim of municipal liability for failure to train an employee who causes harm by unconstitutional conduct for which he would be individually liable."); *Bd. of the County Comm'Rs v. Brown*, 520 U.S. 397, 407 (1997) (noting that the municipality's "continued adherence to an approach that they know or should know has failed to prevent tortuous conduct by employees may establish the conscious disregard for the consequences of their action--the 'deliberate indifference'--necessary to trigger municipal liability"); *Jones v. Chicago,* 787 F.2d 200, 205 (7th Cir. 1986) ("To defeat the City's summary judgment motion, it was incumbent on appellants to show that they would produce 'specific facts' at trial which could establish a deliberate indifference to their constitutional rights or tacit authorization of the employee misconduct."). Therefore, all three prongs require that a plaintiff prove deliberate indifference to establish municipal liability.

22

City liable under this prong of Section 1983, the Plaintiffs have to show that he is a final policymaker for the City and engaged in unlawful conduct. *Id*; *see Davis v. Con-Way Transp. Cent. Express Inc.*, 368 F.3d 776, 783 (7th Cir. 2004) (*quoting Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 600 (7th Cir. 2003)) (stating that "[a] decisionmaker is the person responsible for the contested decision").

The Seventh Circuit has held that final policymaking authority for the CPD resides with the City Council of Chicago and the Police Board. *Auriemma*, 957 F.2d at 400; *see also Beal v. City of Chi.*, 04 C 2039, 2007 WL 1029364, at *14 (N.D. Ill. Mar. 30, 2007); *Zoch v. City to Chi.*, 94 C 4788, 1997 WL 89231, at *43 (N.D. Ill. Feb. 4, 1997). An executive officer may also have final policymaking authority where "an entirely executive decision establishes municipal policy because it is final." *Auriemma*, 957 F.2d at 401. In *Auriemma*, the Seventh Circuit found that the Superintendent of the CPD did not have final policymaking authority because he could not countermand the statutes regulating the operation of the CPD. *Id.* at 401. In the instant case, Cline, the Superintendent of the CPD as of the filing of this case, also lacked policymaking authority because Plaintiffs have not shown that he has the power to countermand the statutes or the policies that regulate the CPD's inventory system. *See Killinger v. Johnson*, 389 F.3d 765, 772 (7th Cir. 2004) ("Plaintiff's municipal liability theory fails because he has not identified any state or local positive law, or custom having the force of law, that grants either the chief or the mayor authority to adopt rules that are relevant to this case.").

Plaintiffs claim, however, that municipal ordinance 2-84-160 has delegated final policymaking authority to Cline because it provides that any inventoried property in the custody of the CPD that is not "claimed by the rightful owner within 30 days of the final disposition of the court proceedings" may be disposed of by the CPD. (R. 311, Pls.' Mem. in Opp. to Summ. J.

23

at 10.) The ordinance further states any such property "if deemed by the superintendent of police to be of use to any city department, may be retained [by the CPD] for use of the department." (*Id.*) Plaintiffs claim that these statements, in conjunction with Cline's testimony that he is administering the CPD's inventory procedures "in a manner consistent with the" City's ordinances, and the City's counsel admission that the Superintendent has "carte blanche" to decide how inventoried property will be handle, prove that Cline has final policymaking authority. (*Id.*)

Contrary to Plaintiffs' arguments, the discretion given to Cline by the municipal ordinance is consistent with Cline's responsibility to execute, as opposed to, make policy. "The fact that a particular official—even a policymaking official— has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. . . . The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." *Pembaur*, 475 U.S. at 481-83; *Auriemma,* 957 F.2d at 401 ("The chief has 'complete authority to administer the department in a manner consistent with the ordinances of the city, the laws of the state, and the rules and regulations of the police board.'); *Eversole v. Steele*, 59 F.3d 710, 716 (7th Cir. 1995) ("The discretion to make final decisions to carry out the policies of a local law enforcement entity does not equate to policymaking authority."). Moreover, Cline's decisions are still subject to review by the City Council and the Police Board so Cline did not have the "final authority" necessary to be a final policymaker under Section 1983. *Compare Praprotnik*, 485 U.S. at 129-30 (finding that the director of a city agency did not have final policymaking authority, despite the fact that he wielded final authority over the plaintiff's transfer, because the city charter authorized the civil service commission to review and set policy on personnel matters); *see also*

24

*Auriemma*, 957 F.2d at 401 (finding that "unless an entirely executive decision establishes municipal policy because it is final, the plaintiffs must lose"); *Rasche*, 336 F.3d at 600 ("the cases limit municipal liability under section 1983 to situations in which the official who commits the alleged violation of the plaintiff's rights has authority that is final in the special sense that there is no higher authority") (internal citations omitted). Furthermore, there is no allegation that Cline departed from or improperly administered the inventory policy, and since we have already determined that the express policy is constitutional, then Cline's administration of and actions pursuant to the inventory policy are also constitutional. *See Auriemma*, 957 F.2d at 400 (" . . . to hold the municipality liable, *Monell* tells us, the agent's action must implement rather than frustrate the government's policy," which itself must be unconstitutional) Thus, Plaintiffs have failed to prove that Cline has final policymaking authority, and Plaintiffs' *Monell* claim fails this test as well.

## B. *Pollard* Notice

Plaintiff Nelson attacks the constitutionality of the *Pollard* notice, claiming that the letter does not provide proper notice. As an initial matter, we note that neither party has raised the standing of the Plaintiffs to challenge the constitutionality of the *Pollard* notice, on the grounds that neither Plaintiff actually received the notice; therefore, we raise it *sua sponte*. *Metallgesellschaft AG v. Sumitomo Corp.*, 325 F.3d 836, 842 (7th Cir. 2003) ("[A] district court may dismiss a case sua sponte for lack of Article III standing if it finds that the plaintiff has not suffered injury-in-fact.") The CPD sends *Pollard* notices to narcotics arrestees where the amount seized is less than $100. (R. 306, Pls.' Resp. to City Defs.' Facts ¶ 43.) Therefore, Plaintiff Gates would not have received a notice because he was not arrested for a narcotics violation. Plaintiff Nelson should have received a *Pollard* notice because he was arrested for a

25

narcotics violation and the CPD inventoried an amount less than $1000 pursuant to his arrest. Throughout his summary judgment filings, however, Plaintiff Nelson asserts that he never received anything in the mail about his inventoried property. (R. 313, Pls.' Mot. for Summ. J., Ex. 6, Nelson Dep. at 110; *Id.,* Ex. 4, City Defs.' Ans. to Pls.' Second Am. Compl ¶ 15; R. 192-2, Fifth Am. Compl. ¶ 15.) In fact, the only notice that Nelson received was not a *Pollard* notice, but rather a letter from the City, sent after the filing of this lawsuit, offering to return his money. (R. 332, City Defs.' Resp. to Pls.' Facts, Ex. D., 6/3/04 Letter.) Because Nelson never received a *Pollard* notice, he does not have standing to challenge its constitutionality.

Rather than dismiss the action, however, it would be appropriate for this Court to allow the Plaintiffs to substitute a new class representative who did receive a *Pollard* notice. *See Whitlock v. Johnson,* 153 F.3d 380, 384 (7th Cir. 1998) (finding that the district court acted properly in allowing the class claims to continue with the substitution of appropriate class representatives despite the failure of the named plaintiff's individual claim on the merits). Such an action will be unnecessary in the instant case because for the reasons listed below, Plaintiffs' attack on the constitutionality of the *Pollard* notices fails.

The parties dispute what documentation is required in order for a narcotics arrestee to reclaim his property. According to Defendants, following a narcotics-related arrest, an arrestee may reclaim funds held "for investigation and/or evidence" by presenting to the Evidence Recovery and Property Section either: (a) a *Pollard* notice; (b) a notice from the State's Attorney's Office following the settlement of the forfeiture action; or (c) a court order from the Asset Forfeiture Court stating that the funds may be released. (R. 306, Pls.' Resp. to City Defs.' Facts ¶ 39.) Plaintiffs claim, however, that the arrestee must present both the *Pollard* notice and

26

a court order, or in the alternative, a Form 54 and the *Pollard* notice in order to reclaim the inventoried property, even though the inventory receipts do not expressly notify the arrestee that he needs a court order or a Form 54 in addition to the *Pollard* notice from the Asset Forfeiture Unit to secure the release of his property.

However, as the relevant information is set forth in the *Pollard* consent decree, the CPD's General Orders, and the relevant statutes, the City is not constitutionally obligated to provide any further notice. *See City of West Covina*, 525 U.S. at 241 (finding that there is no requirement of individualized notice of "state-law remedies which, like those at issue here, are established by published, generally available state statutes and case law. Once the property owner is informed that his property has been seized, he can turn to these public sources to learn about the remedial procedures available to him").

Thus, we cannot find that, as a matter of law, requiring property owners to fill out the Form 54, without informing them of this fact beforehand, renders the *Pollard* notice constitutionally deficient. *See Alexander v. City of South Bend*, 433 F.3d 550, 557 (7th Cir. 2006) (where plaintiff alleges that the police manual's failure to include certain information led to a constitutional deprivation, the court found that "allegations about what is not in the manual hardly establish that South Bend had adopted a policy or had a custom . . . that was indifferent to people's rights").

Finally, there is a section on the inventory receipt marked "Court order - Disposal Instructions," which when viewed in light of the relevant statutes and the General Orders, give Plaintiffs have some indication that a court order might be required for the return of the property. (R. 313, Pls.' Mot. for Summ. J., Ex. 2, Nelson Inventory Receipt.) While it might be better for the City to elaborate on when the circumstances in which a court order is needed might exist, or

27

to include other information that would make it considerably easier for arrestees to reclaim their property; their failure to do so does not render the notice constitutionally suspect, for we have found that the City does not have to anticipate every eventuality that might occur, nor does the City have to adopt the best policy available. *See Butera,* 285 F.3d at 608-609 ("the 'existence or possibility of other better policies which might have been used does not necessarily mean that the [City] was being deliberately indifferent'") (internal citations omitted).

Further, to the extent that requiring additional paperwork to recover the property, or failing to explicitly mention that a court order might be required to obtain the property has led to constitutional deprivations, there is no indication that the CPD was on notice of this fact. *Butera,* 285 F.3d at 609 (finding that the Sheriff was not on notice of a substantial risk of harm to the plaintiff, therefore he was not deliberately indifferent). Similar to the Form 54, Plaintiffs have failed to prove that the failure to inform arrestees that they may need a court order is the "'direct cause' or 'driving force' behind the constitutional deprivation." *Estate of Novack v. County of Wood*, 226 F.3d 525, 530 (7th Cir. 2000).

Plaintiffs also allege that the notice is not meaningful because the City does not attempt to find out if the owner is in jail and simply mails the *Pollard* notices to the individual's last known residence, making it unlikely that he will receive the notice. The Seventh Circuit has held that "when it comes to notice, due process requires 'reasonable efforts at notice,' [but] . . . [u]sing reasonable efforts does not, of course, require that authorities use the best possible method of notification." *Towers v. City of Chi.*, 173 F.3d 619, 628 (7th Cir. 1999). Nevertheless, authorities still must "use the information in their possession to determine whether the notice is reasonably calculated to reach the party who has the right to the notification." *Id.* at 628-29 (noting that "the City might well have an obligation, depending on the 'practicalities and

28

peculiarities' of the situation, to utilize other sources of information readily available to it to determine the identity of the owner and to give that individual notification"). "[W]hen the claimant is incarcerated or in government custody, the ease of learning the claimant's location makes it in most cases 'unreasonable for the . . . agency to fail to ascertain the location of one it knows to be in government custody.'" *Krecioch v. United States, DEA*, 221 F.3d 976, 980-981 (7th Cir. 2000); *Dusenbery v. United States*, 534 U.S. 161, 168 (U.S. 2002) (holding that the government must mail notice to the property owner at the place of incarceration).

Plaintiffs have failed to prove that there is an issue of material fact with respect to whether the City mails the *Pollard* notices to the homes of individuals incarcerated in Cook County jail. Plaintiffs, relying on the affidavit of their paralegal who surveyed the 5,423 undelivered notices produced by Defendants, conclude that "most of the *Pollard* notices are returned undelivered because the owner is in jail." (R. 313, Pls.' Mot. for Summ. J., Ex. 25, Zervas Aff.; 317, Pls.' Mem. at 12.)

We disagree with the Plaintiffs' position for several reasons. First, there is nothing in the record to indicate that the City purposely mails the notice to the last known residence with the knowledge that the individual will not receive it because he is in jail. *Id.* at 980-981 ("Thus, the government violates due process when it purposely mails notice . . . to the claimant's residence knowing that the claimant is incarcerated or in federal custody."). Typically, the 'operative question is whether notice was adequate at the time that the notice was sent . . .'" *See Garcia v. Meza*, 235 F.3d 287, 290 (7th Cir. 2000) (noting that "due process is not satisfied 'if the notifying party knew or had reason to know that notice would be ineffective,' . . . ) (internal citations omitted). However, mail can be returned undeliverable for several reasons, including the fact that the arrestee may have provided a false address at the time of the arrest. *See, for*

*example, People ex rel. Devine v. 30,700.00 United States Currency*, 199 Ill. 2d 142, 154 (Ill. 2002) ("It is frequently the case that currency is seized from individuals who provide false address information to the officers upon seizure.") The Seventh Circuit has declined to impose an affirmative duty upon the government to seek out claimants in each case where its initial notice is returned undelivered or to require actual notice in every case, opting instead to employ "a fact-specific analysis under the due process standard set forth by the Supreme Court in *Mullane*, which requires us to consider all the circumstances of each case to determine whether the notice provided is reasonably calculated to apprise the claimant of the impending proceeding." *Garcia*, 235 F.3d at 291. For this Court to find that mail was undeliverable solely because the individual was in jail and the City disregarded this would be a conclusion based on sheer speculation. *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) ("Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.") (internal citations omitted).

Second, sending notice regarding property retrieval is unlike situations involving notification of a property forfeiture, and the interest at stake are certainly far less, making courts more willing to accept a certain amount of error in providing notice. *Mullane*, 339 U.S. at 314-20 (noting that the type of notification required depends on a number of factors including the nature of the interests involved, the likelihood that others similarly situated will protect a property owner's interests, and the reasonableness of imposing more onerous requirements on the entity obligated to give notice). To impose a greater burden on the City would be contrary to the Seventh Circuit's admonition that "*absent exceptional circumstances*, written notice of forfeiture by certified mail to the claimant's residence satisfies due process even if the claimant does not receive actual notice as a result." *Krecioch*, 221 F.3d at 981 (emphasis added). This

30

statement likely applies also when the City seeks to notify an arrestee that is property is available, where there is far less at risk, and we do not think that those "exceptional circumstances" are present in the instant case.

Third, the Plaintiffs' paralegal only reviewed 50 of the 5,423 notices produced by the Defendants. (R. 313, Pls.' Mot. for Summ. J., Ex. 25, Zervas Aff. at 3.) The affidavit certainly does not support the Plaintiffs' sweeping generalization that "the notice is always sent to a residence and the City never makes any effort to check the jail, even when the first notice is returned as undeliverable." (R. 370, Pls.' Reply in Support of Summ. J. at 19.)

Lastly, the *Pollard* notice is not the only document that the City relies on to give notice. In the instant case, the individual also has the inventory receipt in his possession, which he can take to the police station to inquire about the return of his property at any time. To require the City to make herculean attempts to notify the owner that his property is available for pick up, especially when the owner has the inventory receipt in his possession and can make inquiries himself, goes beyond the boundaries of what due process requires. *See Weigner v. New York*, 852 F.2d 646, 651 (2d Cir. 1988) (stating that "where mailing is supplemented by other forms of notice . . . the risk of non-receipt is constitutionally acceptable"). Thus, we find that the *Pollard* notice comports with due process, and we grant summary judgment in favor of the City Defendants on this claim.[8]

## II.    State Law Claims

---

[8] Because we reject Plaintiffs' claim that the City's inventory policy is unconstitutional under any of the three prongs of municipal liability, we do not have to determine whether the City failed to provide an adequate post-deprivation remedy. *See Parratt v. Taylor*, 451 U.S. 527 (1981) (holding that when a meaningful post-deprivation remedy is available at state law, a state employee's negligent deprivation of a prisoner's property was not actionable under § 1983); *Hudson v. Palmer*, 468 U.S. 517 (1984) (broadening *Parratt's* holding to encompass intentional deprivations).

Plaintiff also alleges state law claims of conversion and replevin. Because we have dismissed Plaintiffs' federal claims, it is within our discretion whether to resolve the state law claims on the merits, or remand the action to state court. *Kennedy v. Schoenberg, Fisher & Newman*, 140 F.3d 716, 727 (7th Cir. 1998) ("the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits"). The Seventh Circuit has held that "a district court should consider and weigh the factors of judicial economy, convenience, fairness and comity in deciding whether to exercise jurisdiction over pendent state-law claims." *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994).

Most of these factors weigh in favor of resolving the claims on the merits. This litigation has been pending before this Court for three years, and this Court is familiar with both the issues and the parties. Consequently, remanding this action to state court would simply duplicate much of the efforts and resources that this Court has already dedicated to this action. *Id.* Jurisdiction should be retained over state law claims when "substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort." *Id.* Furthermore, Illinois law is fairly well settled regarding replevin and conversion so comity will not be affected if we retain jurisdiction. *Id.* at 1252 (finding that "retention of a state-law claim is appropriate when the correct disposition of the claim is 'so clear as a matter of state law that it can be determined without further trial proceedings and without entanglement with any difficult issues of state law'") (internal citations omitted). Accordingly, we resolve each of these claims below.

Plaintiffs allege a state law claim for replevin in their complaint, but they have not addressed this claim in either their motion for summary judgment or in their response to the City

Defendants' Motion for Summary Judgment. As we have previously noted, "[a]ny arguments that are unsupported or underdeveloped are deemed waived." *Gates I,* 331 F. Supp. 2d at 673 (citing *United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir. 1991)); *see also Palmer v. Marion County,* 327 F.3d 588, 597-98 (7th Cir. 2003) (holding that arguments not presented to the court in a response to a summary judgment motion are deemed waived). Accordingly, we grant the City Defendant's motion for summary judgment on the replevin claim.

Next, the City argues that the conversion claim is moot because it tendered the inventoried money to Plaintiffs. In *Gates III,* the Seventh Circuit held that Defendants' tender was insufficient to moot Plaintiffs' due process claims because the tender did not include prejudgment interest, costs, or compensatory damages. 430 F.3d at 431-32. Plaintiffs' state law conversion claim, which was filed after the appeal, was not before the Seventh Circuit; nevertheless, the same rationale still applies. Similar to the its due process claims, Plaintiffs are seeking actual and compensatory damages as well as punitive damages for its conversion claim. (R. 82, Fifth Amended Compl. at 12.) Consequently, any tender offer would be insufficient to make the Plaintiffs whole. *Gates III,* 430 F.3d at 431 (stating that a tender offer involving "cash on the barrelhead to cover costs, interest, and nominal damages will not be enough where the plaintiffs want compensatory damages (if not punitive damages)").

Turning to the merits of the conversion claim, we find that Plaintiffs have raised an issue of material fact as to whether the City unlawfully converted their property for its own use. Conversion is "'the unauthorized deprivation of property from the person entitled to its possession.'" *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.,* 420 F. Supp. 2d 866, 871 (N.D. Ill. 2006) (*quoting Sandy Creek Condominium Ass'n v. Stolt & Egner,* 642 N.E.2d 171, 174 (Ill. App. Ct. 1994). Under Illinois law, in order to prove conversion the

plaintiff must show: "(1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Cirrincione v. Johnson*, 703 N.E. 2d 67, 70 (Ill. 1998). Essentially, the Plaintiffs must show "that the money claimed, or its equivalent, at all times belonged to the plaintiff and the defendant converted it to his own use." *Id.*

Prior to the resolution of their criminal proceedings, the CPD had a right to retain the arrestee's inventoried money. *See* 725 ILCS 5/108-11 ("The court before which the instruments, articles or things are returned shall enter an order providing for their custody pending further proceedings"). After their conclusion, the Plaintiffs had a right to their property, and the right of immediate possession. *See People v. Jaudon*, 307 Ill. App. 3d 427, 447 (Ill. App. Ct. 1999) ("There can be no question that the circuit court would be required to return noncontraband inventoried items seized at the time of arrest when proceedings relative to all State charges have been concluded, assuming, of course, that those are the only charges pending."); *Gates IV*, 435 F. Supp. 2d at 800 (conversion claim did not accrue until date on which arrestee's trial ended and he was able to demand the return of his property). Plaintiffs have shown, however, that the CPD retained the money long after their criminal charges were resolved, when Plaintiffs had a right to the money and a right of immediate possession. (R. 332, City Defs.' Resp. to Pls.' Facts ¶ 14.) *See Powers v. Sliozis,* 89 C 5020, 1991 WL 268667, at *9 (N.D. Ill. Dec. 4, 1991) (finding that although the initial seizure of the money was lawful, Plaintiffs can challenge the "continual holding of the money after the States Attorney decided not to bring criminal charges").

The City also does not dispute that Plaintiffs demanded the return of their property, but it contends that the demand was improper. Few cases discuss what the plaintiff's demand must

34

entail, but the idea that the demand has to be "proper" has some basis in the caselaw. For example, in *Stopka v. Alliance*, 95 C 7487, 1996 WL 494269 (N.D. Ill. Aug. 27, 1996), the court denied summary judgment on the defendant's conversion counterclaim because the defendants did not show that its demand was reasonable or in good faith. In any case, it is axiomatic that a demand must be reasonable, and there are issues of material fact as to whether Nelson and Gates made a proper demand.

First, the City argues that Plaintiff Gates did not have an absolute or unconditional right to possession of his property at the time of his demand because he sought the return of his property prior to the resolution of his criminal charges. However, the City does not deny that both Plaintiffs demanded the return of their property on more than one occasion after the resolution of their criminal cases. (R. 332, City Defs.' Resp. to Pls.' Facts ¶¶ 13, 20; *see also* R. 345, Defs. Exs., Ex. M, Gates Dep. at 81-82 (stating that he sought the return of his money after he entered his guilty plea).) In fact, Gates testified that he attempted to retrieve his money "five or six" times after he entered his guilty plea. (R. 345, Defs. Exs., Ex. M, Gates Dep. at 108.)

Next, the City argues that there is "no evidence that Gates and Nelson ever made a demand for their money at the appropriate place with the proper release paperwork and was refused the return of their money." (R. 338-2, City Defs.' Mem. in Support of Summ. J. at 26.) First, we note that there is some dispute as to what paperwork is required for narcotics arrestees to reclaim their property. Defendants have presented evidence that an arrestee does not have to present a Form 54 to recover property seized following a narcotics arrest. (R. 338, Defs.' Mem., Ex. B., Mot. to Enforce *Pollard* Consent Decree at 9 (citing Mitkal Aff. ¶ 6).) Plaintiffs also cite to evidence indicating that the *Pollard* notice and a court order, or the *Pollard* notice and a Form 54 are required for narcotics arrestees to retrieve inventoried property. (*See* R. 306, Pls.' Resp.

to City Defs.' Facts ¶ 39 (citing Dugan Dep. at 99, 100, 137, 138).) At the very least, we know that Nelson went to the station with his inventory receipt, but was unsuccessful in retrieving the money; it is disputed, however, what paperwork was actually required.

The City also argues that Nelson failed to go to the appropriate place to retrieve his money, relying on his testimony that he went to the police station where he was taken after his arrest, was told to go to a different police station to retrieve his property, but failed to follow the officers' advice. (R. 338-2, City Defs.' Mem. in Support of Summ. J. at 26; R. 345, Defs.' Exs., Ex. N, Luster Dep. at 56-58.) A jury could, however, find that Nelson's demand of his money at the station where he was arrested is sufficient to establish this prong of conversion. In the alternative, a jury could find that Nelson did not make a proper demand if he failed to go to the police station indicated on his *Pollard* notice (if he in fact ever recieved a *Pollard* notice, which he denies) or to the station where the officer directed him to go. In any event, there are enough holes in the record to establish that there is an issue of material fact as to whether Plaintiff Nelson made a proper demand for his property. Because there is an issue as to whether Nelson made a proper demand, then this Court cannot conclude that the City "wrongfully and without authorization assumed control, dominion, or ownership over the property," *Cirrincione,* 703 N.E. 2d at 70; *see also Std. Car Truck Co. v. Consolequip, Inc.,* 2001 WL 1665221 (N.D. Ill. Dec. 27, 2001) (finding that defendant's possession was wrongful where plaintiff had a right to the property and demand was made).

Unlike Plaintiff Nelson, the City does not point to any specific facts that Plaintiff Gates failed to go to the appropriate place with the proper release paperwork and was refused the return of his money. The City relies on Gates' testimony that when he went to claim his money, the arresting officers never refused to sign the Form 54 to release it, (R. 345, City Defs.' Ex., Ex.

36

N., Gates Dep. at 84). The City's argument, however, ignores Gates' testimony that on at least one occasion when he went to demand his money, the arresting officers were not there. (*Id.* at 94.) This evidence is probative of whether Gates' demand was futile because, although the arresting officers never refused to sign the Form 54, if an arrestee is unable to locate the officer after repeated attempts, then this would render demand futile. *See Runnemede Owners, Inc. v. Crest Mortg. Corp.,* 861 F.2d 1053, 1060 (7th Cir. 1988) (noting that an action for conversion must include a demand for possession unless the plaintiff presents objective facts demonstrating futility).

In fact, Gates' testimony indicates that the CPD gave him the run around when he tried to retrieve his money. Gates testified that when he went to the 26th and California courthouse to retrieve his money, he was told that he should go to the Homan Avenue police station, where officers then instructed him to go back to the 15th District. (*Id.* at 81.) In fact, Gates testified in his deposition that he tried several times to retrieve his money from the 15th District after he pled guilty, and was told that he could not retrieve his money. (*Id.* at 81-82, 108.) In any event, a jury might credit his testimony that he demanded the return of his property, but demand was futile. *See Airlines Reporting Corp. v. Private Label Travel,* 1994 WL 323125, at *1 (N.D. Ill. Jun. 28, 1994) ("a failure to reply to a demand or perform some simple act necessary to surrender may amount" to an "unqualified refusal to surrender on demand"). Because Gates has established that there is a material issue of fact regarding whether he made a proper demand for his money, there is also an issue of material fact as to the fourth factor, whether the City wrongfully asserted control over the property. *Powers v. Sliozis,* 89 C 5020, 1991 WL 268667 (N.D. Ill. Dec. 4, 1991) (noting that once the defendant made the decision not to prosecute the plaintiffs and the plaintiffs demanded the return of the property, then the defendants lose their

right to possess the property). If a jury determines that both Nelson and Gates made a proper demand for their money, then the City's failure to return the property would constitute unlawful control, dominion, or ownership over the property without Plaintiffs' consent.

The City Defendants also argue that Plaintiffs are not entitled to punitive damages on their conversion claim. Punitive damages are awarded "when torts are committed with fraud, actual malice, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353 (Ill. 1978); *Cirrincione,* 703 N.E. 2d at 70. "The question of whether punitive damages can be awarded for a particular cause of action is a matter of law." *Id.* Moreover, it "is undisputed that in Illinois the tort of conversion may under proper circumstances support an award of punitive damages." *Turner v. Firstar Bank, N.A.*, 845 N.E. 2d 816, 825 (Ill. App. Ct. 2006). However, "the question of whether a defendant's conduct was sufficiently willful or wanton to justify the imposition of punitive damages is for the jury to decide." *Cirrincione,* 703 N.E. 2d at 70. Consequently, since we have determined that there is an issue of material fact as to whether the Plaintiffs have established that their property was unlawfully converted, we leave to the jury to decide whether the City's conduct warrants the imposition of punitive damages. Accordingly, we deny the City Defendants' and the Plaintiffs' motion for summary judgment on the conversion claim.

Finally, Defendants argue that the conversion class should be decertified. The party seeking class certification bears both the burden of demonstrating that initial certification is appropriate, *Retired Police Ass'n*, 7 F.3d at 596, and also bears the burden of demonstrating the continued propriety of maintaining the class action, *Stastny*, 628 F.2d at 277. Defendants argue that Plaintiffs have not presented evidence that there are other individuals in the class that can satisfy the requirement that they made a demand for possession of the property that was

wrongfully denied, and thus, have failed to establish numerosity. (R. 270, City Defs.' Mem. in Support of Summ. J. at 12.) In other words, the City Defendants' argue the Plaintiffs would have to establish the elements of the conversion claim as to each putative class member. It is sufficient, however, that the class is defined in a manner to include only those individuals who made a demand for their property. *See Gates V*, 456 F. Supp. at 968 (noting that "demand is a required element for . . . conversion" and modifying the subclass to include the requirement that "the arrestee demanded return of the money seized, unless such demand would have been futile under the circumstances"). As mentioned in a our previous opinion, because of "the thousands, if not tens of thousands of arrestees every year," such a class could potentially "exceed[] one thousand," *Gates II*, 2004 WL 2583905. We still believe this to be true. Plaintiffs have filed a notice of additional class representatives, (R. 232), indicating that there are at least some other individuals who have made the requisite demand for their property. In addition, between March 2003 and December 2004, the City had over fifteen million dollars in forfeitures. (R. 276, City Defs.' Summ J. Exs, Ex. L, "Money Inventoried in the Chicago Police Department eTrack System.") This counts for 20,362 inventories forfeited during that time period alone, (*id*), and this Court will not assume, without more, that there were not at least forty individuals who made a demand for their money. Numerosity does not require that Plaintiffs "specify the exact numbers of class members as long as they have made a good faith estimate," *Gates II*, 2004 WL 2583905, at *5, and common sense dictates that, given the number of arrestees and forfeitures, it is likely that there are enough individuals who made a demand for their property that joinder is impractical. *See Arenson v. Whitehall Convalescent & Nursing Home*, 164 F.R.D. 659, 662 (N.D. Ill. 1996) ("the court is entitled to make common sense assumptions in order to support a finding of numerosity"). We note, however, that the inquiry into whether demand was proper

might defeat predominance and make class certification on the conversion claim improper. *See Hudson v. City of Chi.*, 242 F.R.D. 496, 504 (N.D. Ill. 2007). Thus, we will give the City Defendants fourteen days after the date of this opinion to file a motion to decertify the class and the Plaintiffs seven days thereafter to respond.

## CONCLUSION

We grant the Officer Defendants' motion for summary judgment (R. 321) in its entirety. The City Defendants' motion for summary judgment (R. 268) is granted in part and denied in part. We grant the City Defendants' motion for summary judgment on the due process and the replevin claims, and deny the Plaintiffs' motion for summary judgment (R. 317) on these claims. We deny both the City Defendants' and the Plaintiffs' motions for summary judgment on the conversion claim, and find that there is an issue of material fact as to whether the City unlawfully converted the Plaintiffs' property. The City Defendants have fourteen days to file a motion to decertify the conversion class, and the Plaintiffs have seven days thereafter to respond.

The parties are requested to reevaluate their final settlement positions in light of this opinion. A status hearing will be held in open court on September 6, 2007, at 9:45 a.m.

ENTERED

**Judge Ruben Castillo**

**DATED:** August 24, 2007

40